[No. 3947.]

## EDWARDS V. ROBERTS.

1. WATER RIGHTS—*Nature and Foundation of the Right.* The right of the citizen to occupy the lands of the public domain in the arid region for the construction of ditches and reservoirs for irrigation has its foundation in necessity. The right always existed, and the acts of Congress which seem to grant such right, in reality only recognize and confirm it. (552)

2. —— *Intermittent Use of Works for Irrigation—Effect Upon the Right.* The use of works for irrigation, is, in all cases, with us, necessarily intermittent, depending upon the season, the crop, the rainfall, the relative priority of different ditches and reservoirs, and other similar considerations; but the easement is necessarily continuouus. Interruption of the use by the absence of water in the stream which is the source of supply, or the casual destruction of the works of diversion or storage, by floods, or the like, has not the effect to impair the appropriator's right. (550)

3. ·RESERVOIRS—*Easement ·For—Extent Of.* The · area to which the lands of one person may be submerged by the reservoir of another, constructed while such lands were part of the public domain, is not to be extended beyond the limit of actual use, and should be restricted to the smallest area consistent with the useful enjoyment of the reservoir. (553)

4. CASES OVERRULED, explained or distinguished. Tynon v. Despain, 22 Colo. 240, and Blake v. Boye, 38 Colo. 55, explained. (546-548)

5. STATUTES—*Construed—Pacific Railroad Acts.* The act of Congress of July 26, 1866 (14 Stat. at Large, page 253, and its amendments) operate as a reservation from the congressional grant of land to the Union Pacific Railway Company in aid of the construction of its railroad, and in favor of the owner of irrigation ditches and reservoirs used in connection with water rights which became vested under the local customs and laws prior to the issuance of patent to the railroad company. Tynon v. Despain, 22 Colo. 240; Highline Canal Co. v. Moon, Id. 560, followed. (546, 547)

· No distinction is recognized between ditches and reservoirs for irrigation. (547)·

The right of the appropriator depends solely upon the reservation under the act of Congress, and not upon any agreement, express or implied.* (546-550)

6. NOTICE—*Claim of Reservoir Site.* The map of a reservoir site, with the required statement thereon, filed pursuant to the act of April 20, A. D. 1887 (Laws 1887, 314) is constructive notice of the contents thereof to all persons subsequently dealing with the lands described therein, as to the site of the reservoir.* (548)

7. Estoppel—*By Conduct.* Land owner without objection or protest acquiesces in the construction by another of a dam or like works for the diversion or storage of water for irrigation, the effect of which is to flood and submerge a part of his lands; he is estopped from afterwards maintaining either ejectment or trespass for the entry. (549)

His only remedy is an action for damages and the right of action vests in the one having the title to the land at the time of the entry. (549)

8. Evidence—*Judicial Notice,* taken, of the acts of Congress known as the Pacific Railroad Acts. (544)

*Syllabi by King, J.

*Error to Weld District Court.* Hon. J. E. Garrigues, Judge.

Mr. John T. Jacobs for plaintiff in error.

Mr. H. N. Haynes, Mr. John C. Nixon, Mr. Thomas A. Nixon for defendant in error.

King, J., delivered the opinion of the court.

For convenience, the plaintiff in error will be called defendant, and defendant in error will be called plaintiff, as in the trial court.

March 17, 1909, plaintiff purchased, and obtained a deed for section 29, township 6 north, range 63 west, Weld county, Colorado. September 22nd he filed his complaint, in the nature of ejectment, against defendant Edwards and one R. L. Dougherty, alleging ouster of the plaintiff from about 200 acres of said land, and asked for possession, and damages in the sum of $10,000. The act of defendant constituting the alleged ouster was the flooding, in the spring of 1909, of 119 acres of said section, by filling a reservoir known as the "Wadlin Reservoir," situated in part on said section 29, and in part on section 30, same township and range. Defendant was the owner of section 30, and attempted to justify, by pleading and proving that he was the owner of said reservoir; that he and his grantors constructed and had been in possession of the same, and used it for the storage of water for irrigation, beginning in the year 1888, and every year thereafter; that his right to use a portion of section 29 as an easement for his reservoir was superior to plaintiff's right to possession as

fee owner. This superiority of easement was based upon the allegations of two defenses: First, that at the time of the construction of the reservoir and ditch by which water was conveyed thereto, section 29 was owned by the Union Pacific Railway Company, by virtue of certain acts of congress, and that the ditch and reservoir were built and thereafter used with the knowledge, acquiescence and consent of said company and its grantees; second, that at the time of the construction of said ditch and reservoir, and for several years thereafter (until 1897), the title to said section was in the United States government; that prior to the issuance of patent to the railway company, defendant's grantor, Wadlin, by priority of possession and use, had acquired vested rights to the use of water for agricultural purposes to the extent of 44,000,000 cubic feet of water, to be carried through said ditch, and stored in said reservoir; the source of supply being Crow creek, a natural stream, and the carrying capacity of the ditch 135 cubic feet of water per second of time; that said rights had vested and accrued by virtue of local customs and laws, and by decisions of the court evidenced by an adjudication of water rights made in 1895, and that the right of way for the construction and maintenance of the ditch and reservoir, for the purpose of carrying and storing said water was granted by certain acts of congress and had priority of right for such purposes over the fee vested in the railway company by patent thereafter issued. Except for the allegation that the railway company was the owner of the land at the time the reservoir was made, the allegations of the answer were put in issue by replication; and by way of new matter it was alleged that all acts of defendant in flooding said lands were trespasses; that any use of the reservoir site by defendant and his grantors was intermittent, in occasional years or seasons only, with long periods of years of abandonment between, in which no water was placed in the reservoir, and no attempt made to place water therein; that the use of the reservoir for storage purposes was impracticable, and the land to be served thereby

not worth as much as defendant's land injured thereby.

Judgment was rendered, ousting the defendant from the possession, but granting to him thirty days in which to begin proceedings in eminent domain to condemn plaintiff's land for use as a reservoir site.

There is some conflict in the evidence. But certain matters are either admitted or not disputed by the evidence. Crow creek is a natural water way which in most years carries a great volume of water at flood seasons, but becomes practically dry in the latter part of every season, and in occasional years supplies very little water, if any, for storage. About the year 1888, John Wadlin began the construction of a ditch to convey water from Crow creek to his lands, including that in section 30, and at the same time located a reservoir site on the course of said ditch, and filed his sworn statement and map of the ditch and reservoir in accordance with the statute then in force. The reservoir as contemplated occupied a part of sections 29 and 30. As shown by the record, the dam of said reservoir was situated entirely upon section 30, the ends reaching to a short distance west of the west line of section 29, the grade falling westerly toward section 30. In 1892 said dam was completed and the reservoir filled so as to flood that portion of section 30 east of the dam, and a considerable portion of section 29, about 140 acres of which were claimed for reservoir, and the water so stored was used by Wadlin for irrigation purposes. It is admitted that in 1892, about 100 acres of section 29 were flooded; that in 1895, 1899 and 1904, more than 100 acres thereof were submerged, and that in the years 1894, '6, '7 and '8, 1901 and '3, thirty or forty acres of said section were submerged; but it is contended that in the years 1893, 1900, '2, '5, '6, '7 and '8, this land was not flooded at all. As to this latter contention there is some conflict. One witness testified that he ran water into the reservoir nine years out of eleven. The water so stored did not remain in the reservoir for many weeks during any season, as it was drawn out and used for irrigation, after which the

land in section 29 was used for pasturage, and in some instances produced a fair quantity of hay, which was harvested by the owners of section 29. It is not in evidence that the reservoir site was not used for storage at any time when there was water in the stream for storage purposes, except when the outlet of the reservoir or the dam in the stream washed out. In 1906 the original lumber outlet to the reservoir was replaced by a substantial cement outlet, and there is some evidence that the reservoir was filled that season. About the year 1907 the intake ditch was partially filled where a road crossed it, and so remained until the obstruction was removed in the spring of 1909 after plaintiff purchased the land. The dam was sometimes out of repair, but work was done on it from time to time and from year to year for the purpose of making it effectual. It is shown that Wadlin was the owner of a large body of land, subject to irrigation from the reservoir and ditch, but which had some other source of supply; the amount of land irrigated from the reservoir is not clearly shown. The land selected for reservoir site was a natural depression in which water stood before the building of the dam. In 1895 said reservoir was decreed priority No. 10, for 44,-000,000 cubic feet of water.

Plaintiff deraigned title from the government by patent issued to the Union Pacific Railway Company, bearing date November 12, 1897, and by numerous *mesne* conveyances. Of plaintiff's grantors, F. C. Grable took title October 14, 1905. Grable conveyed to Ernest O. Ellsworth, September 29, 1906, and Ellsworth to plaintiff, March 17, 1909. The last two deeds of conveyance contained the following exception: "Subject to all existing ditch and reservoir rights." Grable had known of the existence of this reservoir for from fifteen to eighteen years. When plaintiff passed over the land in February, 1909, prior to purchase, and when at a place on said land from whence the dam could have been seen if he had looked, he was informed by the person showing him the land, that an old reservoir site was situate thereon, and soon

after his purchase he was notified by the owner of the reservoir, or some one representing him, that the land would be flooded. Soon thereafter the dam and intake ditch were repaired, and the reservoir filled from the flood waters to the extent that 119 acres of said section 29 were flooded. There is no doubt from the evidence that everyone in the vicinity of these lands knew in a general way of the existence and use of the ditch and reservoir. The trial court held that, according to the evidence, no actual trespass had been committed on section 29 in the *construction* of the reservoir; that the trespass, if any, consisted in flooding it after the reservoir on section 30 had been completed; that when the reservoir was constructed, said section 29 was a part of the open range, unfenced, unimproved, unoccupied; that it belonged to the Union Pacific Railway Company, being one of the alternate sections included in its grant from the federal government; that there was no evidence that the railway company had permitted, consented or agreed to the use or occupation of the land for reservoir site, or acquiesced therein, and further found that at no time after the title passed from the railroad company had any owner thereof consented or agreed to or acquiesced in the flooding of said section 29, and on such finding ruled that the original flooding of the land, and each flooding thereafter, was a trespass; that no right can be initiated by trespass, and instructed the jury to find a verdict for plaintiff.

It is contended by counsel for plaintiff in error that the precise question for determination has been settled by the Supreme Court of this state in *Tynon v. Despain*, 22 Colo. 240, 43 Pac. 1039. The effect of that decision, taken together with *Highline Canal Company v. Moon*, 22 Colo. 560, 45 Pac. 437, is that the act of congress of July 26, 1866, section 9 (14 Stat. at Large, page 253) and its amendment (section 17, act approved July 9, 1870, 16 Stat. at Large, page 218), whether considered as a grant or as a legislative recognition of a pre-existing right, operates as a reservation from the general railroad grants, in favor of irrigation ditches and reser-

voirs used in connection with water rights which become
vested under the local customs and laws prior to the issuance
of patent.    See also *Adams v. Reed*, 11 Utah 480, 40 Pac.
720.    Unless precluded by the grant to the railway company
as constituted by the acts of congress, approved, respectively,
July 1, 1862, July 2, 1864, July 30, 1866, and March 3, 1869,
commonly known as the "Pacific Railroad Acts," it is clear
that any rights which the owners of the Wadlin reservoir ac-
quired for purposes of storing water on section 29, vested or
accrued under the local customs and laws of the state of Colo-
rado, and the decisions of its courts, were and are superior to
the title of the plaintiff.   Those acts (of which the court takes
judicial notice) are pleaded and relied upon by both plaintiff
and defendant.    Plaintiff contends that said grants by con-
gress to the Pacific railway companies were grants *in praesenti*
as of a date not later than approval of the definite location
of the line of the Denver Pacific Railway, to-wit, Au-
gust 20, 1869, which, by relation, becomes the date when the
government patent to the land took effect   This contention is
sustained in *Howell v. Killie*, 17 Colo. 88, 90, 28 Pac. 464,
and *U. S. v. U. P. Ry. Co.*, 148 U. S. 562, 570, 17 L. Ed.
560, 563, 13 Sup. Ct. 724.   From these decisions and the rule
they establish, the conclusion is drawn by plaintiff, and would
seem to follow, that after August 20, 1869, this land was not
subject to settlement as a part of the public domain, nor to
reservations for easements, for any purpose which would in-
terfere with possession, or affect the fee title when vested by
patent.    However, that conclusion is in direct conflict with the
decision in *Tynon v. Despain, supra*.    In that case the claim
to an easement for an irrigation ditch over several different
tracts of land was involved, including a portion of section 25,
in the opinion designated as the "railroad tract," and a part
of the grant to the Denver Pacific railroad.    The court said:

"To the building of the ditch across all of these lands,
*except the railroad tract*, the occupying claimants gave their
consent in consideration of the benefits which they considered·

the ditch for agricultural purposes would be to their holdings. No express consent was given for building across the railroad tract, for it was then unoccupied, * * * and no permission at all as to the railroad tract."

The evidence in that case showed that the ditch was built in the year 1874, five years after the congressional grant became effective by the filing and approval of the map of definite location. The lists of selections of certain tracts under the acts aforesaid, filed by the land agent of the railway company, were made in 1878 and '9, and thereafter patent issued to the railway company and title passed to the defendants against whom the right of way was asserted. In respect to the railroad tract, the facts of that case are precisely parallel to those in the case at bar in every material matter up to the time that the title passed from the United States by its patent to the railway company, so that the rights acquired in the inception of the easements in the respective cases, up to the time of the issuance of patent, are governed by the same rule. The court, in an opinion delivered by Mr. Justice Campbell, said (22 Colo. 249, 43 Pac. 1042):

"It is clear, therefore, that the railway company took its lands subject to the burden of this easement. It is equally apparent that the act of 1866 operated as a grant to the owners of this ditch of a right of way across the lands of an *occupying claimant,* under the United States land laws, when the *inception of the latter's rights accrued under filings made after the passage of the act.* (Italics ours). This right of way for the ditch, it is true, must be compensated for, if its construction injures the *possession* of those on the public domain; but so far as the right to burden the land with a ditch is concerned, by this act of congress the absolute right was granted by the government to build a ditch across it. * * * Under the said acts of congress the grantees of the land, now owned by the defendant, took them subject, by operation of law, to the burden of the right of way for the ditch."

The acts of congress referred to in the opinion are the same acts that are relied upon in the case at bar. The rights of the railroad company did not take effect, even under the grant, until August, 1869, long after the passage of the act of 1866 to which the court refers.

In *High Line Canal Co. v. Moon, supra,* the same rule is announced as in *Tynon v. Despain,* the difference in the facts being that the tract of land there involved was a parcel of "school land" which was given to the state by the national government. Across this parcel of land a ditch was begun in 1873, and thereafter completed and used continuously. There was some question as to whether the grant from the United States to the State of Colorado took effect in 1861 or in 1876. It was contended that the grant made in 1876 was *in praesenti* under the act of 1861, and took effect upon the formation of the state; but the court said:

"Whether the grant from the United States was one *in praesenti,* under the act of 1861, to take effect upon the formation of the state, or was made by virtue of section 7 of the enabling act of March 3, 1876 (1 Mills' An. Stats., p. 92), we need not determine; for in *Broder v. Water Company,* 101 U. S. 274, 25 L. Ed. 790, it was held, in a case somewhat similar to the one at bar, that the act of 1866 referred to 'was rather a voluntary *recognition of a pre-existing right of possession,* constituting a valid claim to its continued use, than the establishment of a new one;' from which it would seem to follow that the petitioner's easement in controversy here was a pre-existing right, antedating the passage of the organic act of the territory, and so protected by the rule in the *Tynon case, supra.*"

Inasmuch as we have concluded that the ruling in the *Tynon* case is directly in point, and decisive of the issues herein made, irrespective of the question of any agreement, consent, acquiescence or waiver alleged by defendant and denied by plaintiff, and that this court should observe the rule *stare decisis* in regard to such issues, we shall not enter into

any original reasoning to support or to overthrow the ruling in that case, but will, by further comparison, show that the cases are parallel, and cannot be distinguished as to any matters upon which the judgment herein can be affirmed. We recognize no distinction between an easement for an irrigating ditch and for an irrigating reservoir. The contention is made by defendant that the ruling in the *Tynon* case, though pertinent, is not controlling, because the court in that case held also that the owner of the railroad tract, after the issuance of patent to the railroad company, acquiesced in and consented to the operation and maintenance of the ditch over that tract, for which reason it is said that the question as to whether the act of building the ditch prior to patent was lawful, or a trespass, was immaterial, and that the ruling of the court upon that question was mere *dicta*. We are unable to give our consent to this contention. The further finding of the court in that case, that, after the issuance of patent, the owner of the land consented to its use by the ditch owner, was an additional and cumulative reason why the easement should be upheld; but it is manifest that that reason was unnecessary as a basis for judgment, after the court had first decided that the entry upon the land for the purpose of making the ditch, and its use thereafter prior to patent, was lawful. Defendant further urges that the *Tynon* case can be distinguished from the case at bar because in that case the physical structure of the ditch was upon the land in dispute, while in this case the physical structure of the reservoir, *i. e.*, the dam, was not upon section 29, although the effect of the dam was to submerge it. This is a distinction without a difference, except upon the question of notice to subsequent purchasers of the existence of the easement. In the case at bar it is clearly shown—and, indeed, admitted—that the plaintiff took his deed with a clause subjecting the title conveyed, to all existing ditch and reservoir rights; that while upon the land, before purchasing, he was advised that a part of the land was or had been occupied as an old

reservoir site, and was told of the reservoir "filings." Prior grantors had taken like deeds, and it is in evidence that at least one of the grantors had known of the existence of this reservoir for from fifteen to eighteen years, and of the adjudication decrees and filings, and that the existence of the reservoir was generally known. The maps and sworn statements of ditch and reservoir provided by statutes in force in 1888 and subsequent thereto were of record, and plaintiff and his grantors had been so advised. This record, we think, operated as constructive notice to the plaintiff of the matters therein shown. It is contended by defendant that under the decision in *Blake v. Boye*, 38 Colo. 55, 88 Pac. 470, 8 L. R. A. (N. S.) 418, and cases there cited, these records do not operate as constructive notice; but it must be observed that such decision was based upon the prior ruling of the Supreme Court in *Lamar Company v. Amity*, 26 Colo. 370, 58 Pac. 600, 77 Am. St. 261, that the statute of 1881, under which the sworn statements were filed, had been declared unconstitutional. That statute was held unconstitutional for the sole reason that the subject matter was not clearly stated in the title of the act. The statute of 1887, under which the filings in this case were made, has not been declared unconstitutional, but has been regarded as in force ever since its enactment. We think that the plaintiff in this case, having had both actual and constructive notice of the existence of the reservoir and of the claims of the owners thereof, or notice of such matters as to put a purchaser on inquiry, will be charged with knowledge of all such facts as he might have acquired had he made due inquiry, which would include the filings and decree, and he cannot now aver that he bought in ignorance of such rights and claims.—*Grand Valley Irr. Co. v. Lesher*, 28 Colo. 273, 289, 65 Pac. 44. He is in no better position than he would have been had the entire physical structure of the reservoir been situated upon section 29. Therefore, the distinction attempted to be made between the *Tynon* case and this case fails.

We have shown that the judgment of the trial court was based primarily upon the finding that the original taking of the land for reservoir site was a trespass, because the land belonged to the Union Pacific Railway Company at that time, and that such finding is opposed to the principle settled in the *Tynon* case. It is also opposed to the ruling in *Roberts v. N. P. R. Co.*, 158 U. S. 1, 39 L. Ed. 873, 15 Sup. Ct. 756, in holding that no right can be initiated by trespass. In the case last cited it was held that where a railroad company *having the power of eminent domain* has entered into actual possession of the land necessary for its corporate purposes, whether with or without the consent of the owner of such lands, a subsequent vendee of the latter takes the land subject to the burden of the railroad, and that the right to payment from the railroad company if it entered by virtue of an agreement to pay, or to damages *if the entry was unauthorized*, belongs to the owner at the time the railroad company took possession; and it was further held that if the land owner, knowing that a railroad company has entered upon his land and is engaged in constructing its road without having complied with the statute requiring either payment by agreement or proceedings to condemn, remains inactive and permits it to go on and expend large sums in the work, he will be estopped from maintaining either trespass or ejectment for the entry, and will be regarded as having acquisced therein, and be restricted to a suit for damages. Of course, if such be the rule as to a railroad company, it is likewise the rule as to an individual having the right of eminent domain and who entered upon the land of a remote grantor of the plaintiff, either with or without authority of law. We think the record very fairly establishes acquiescence and waiver by the acts of plaintiff's grantors, and for that reason he cannot maintain ejectment as to such rights as the defendant and his grantors acquired upon section 29 by the actual use of said lands for reservoir purposes.

Defendant urges that the statute of frauds pleaded by him is of itself sufficient to affirm the judgment. This contention might be available if the right to the easement depended upon an agreement, affecting the real estate, but, as we have shown, the question of such consent or agreement is immaterial, the right being predicated upon and upheld under the act of congress, and not upon any agreement, express or implied.

In support of the judgment, it is also asserted that no easement can be predicated on an intermittent use such as is here shown; but where the right of eminent domain can be successfully invoked, we think the question of intermittent use is not controlling. The use of practically all irrigation works, such as ditches and reservoirs, in this altitude and latitude is necessarily intermittent, as, indeed, is all irrigation, the continuity of which depends on the crops, the season, the rainfall, the relative priority of ditches and reservoirs, etc. But while the use of such works is intermittent, the easement therefor is necessarily continuous, in order to be ready for use when irrigation is required and the supply of water for storage or immediate use is available. We believe it has never been, nor can be successfully, asserted that such intermittent use as is here shown would prevent the taking of land under the eminent domain act for ditches and reservoirs. Indeed, the plaintiff's theory, as shown by his pleadings and briefs, is that the land involved in this case can be so taken if the damages be first fixed and compensation paid. That fact, once conceded, carries with it, we think, the inevitable conclusion that the taking and use, without objection, for such purposes, under the acts of congress, before patent, gives the right to retain possession.

It is seriously urged upon us that this court should not be governed by the *Tymon* case; but the decision of this case turns upon the construction of certain acts of congress which were there construed, and the law as so construed was the law of this state when patent issued. As plaintiff purchased

his land subject to existing ditch and reservoir rights, he loses no rights which he purchased, and we violate no principle of law or equity in abiding by the rule *stare decisis.* It is the established practice of this court, and we believe it proper, to observe that rule in general, and especially where a review may be had in the Supreme Court, which is not restricted by its own decisions as this court necessarily is.

If we felt free to follow our own interpretation of the law, rather than to stand by decided cases, we might easily, and, we think, properly, hold that Wadlin had a right to enter upon the land in dispute and build his reservoir thereon under section 3 of the act of congress of July 1, 1862, (12 Stat. at Large, p. 1492), which provides that "all such lands so granted by this section which shall not be *sold* or *disposed of* by said company within three years after the entire road shall have been completed, shall be subject to settlement and preemption like other lands, at a price not exceeding $1.25 per acre, to be paid to said company." There is not a scintilla of evidence in this case to show that section 29 was disposed of by the company until the date of patent—some twenty-eight years after the definite location of the line, perhaps a quarter of a century after the road was completed, and nine years after the reservoir dam was begun; but we have no doubt it could be shown that all the property of the Denver Pacific Railroad Company, including its interest in these lands, was pledged as security for its bonds, and thereafter mortgaged, prior to the initiation of the reservoir. In *Platt v. U. P. R. R. Co.,* 99 U. S. 48, 25 L. R. A. 424, it was held that such mortgage constituted a disposal of the land, within the meaning of the act. Following our own reason in interpreting the act, we would agree with the dissenting opinion of Mr. Justice Bradley, concurred in by Justices Clifford and Miller, which holds that by the mortgage the lands were not "disposed of" within the contemplation of the act, and were therefore subject to settlement, conditioned only upon the payment of $1.25 per acre to the railroad company;

but that point is decided, and we stand by that decision, as we do by the *Tynon* case.

We are unwilling to conclude this opinion without expressing our conviction that the principle announced in the *Tynon* case by which that decision, as to the "railroad tract," is governed, is sound. The right to occupy land on the public domain before patent, when necessary for ditches and reservoirs incident to the acquisition and use of water for irrigation, has its roots deep in the natural conditions which exist in the arid regions. It springs from the necessity for irrigation, without which the land must remain barren and practically uninhabitable, but with which it is made to fructify and provide abundant sustenance for multitudes to whom it may then offer a home and abiding place. Because of this necessity, the courts have wisely held that the right to these easements always existed, and therefore was pre-existent to the acts of congress which seemed to grant, but which in fact only recognized and confirmed it, and that it was not taken away by those other acts of congress by which vast areas of public domain were granted by wholesale gift to railroad corporations in aid of the construction of their railroads, but although not exercised until after the railroad grants had attached, remained unimpaired, except as to payment of damages to possessory rights, at least until by the issuance of patent prior to occupation of such lands by the owner of water rights for irrigation, the acquisition of easements therefor became subject to state laws only. "Primarily, where the climatic conditions are such as exist in Colorado, the right to convey water for irrigation purposes over land owned by another is founded on the imperious laws of nature, with reference to which it must be presumed the government parts with its title."—Chief Justice Thatcher, in *Schilling v. Rominger,* 4 Colo. 100, 109; *Yunker v. Nichols,* 1 Colo. 551; *DeGraffenried v. Savage,* 9 Colo. App. 131, 47 Pac. 902. Nor do we wish to be understood as blindly following decided cases. Following precedent, when established by well con-

sidered decisions of our courts of last resort, is not an abandonment of principle, but rather an adherence thereto; an application of accepted principles to the facts under consideration, to the end that justice under the law may be a more certain measure of man's rights, and that its standard may be known, or, at least, knowable.

For the reasons given, the judgment is reversed and the cause remanded for further proceedings in accordance with the views herein expressed.

We will not undertake to determine, nor suggest, the area of said section 29 which is properly subject to use by the defendant for reservoir purposes, further than to say that it cannot be extended beyond the limit of actual use as shown by the evidence, and should be restricted to the smallest area consistent with practical use of the reservoir, having in view the intermittent supply of water and the right of the owner of the servient estate to have the fullest possible use of his lands.

*Reversed and Remanded.*

Decided November 9, A. D. 1914. Rehearing denied December 14, A. D. 1914.